Filed 12/9/20  Tang v. JPMorgan Chase Bank CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| VINCENT TANG,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>JPMORGAN CHASE BANK, N.A. et al.,<br><br>        Defendants and Respondents. | H045898<br>(Santa Clara County<br>Super. Ct. No. 17CV307324) |
| VINCENT TANG,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>        Defendant and Respondent. | H046697 |

Appellant Vincent Tang took out a loan to purchase a home, secured the loan with a deed of trust, and defaulted on the loan.  The property was subsequently sold in a nonjudicial foreclosure sale.  After the foreclosure sale, Tang brought suit against multiple entities and an individual who had handled the deed of trust—including respondents JPMorgan Chase Bank, N.A. (Chase), Select Portfolio Servicing (SPS), U.S.

Bank, N.A. (U.S. Bank), and Deborah Brignac (collectively, defendants).[1] The trial court sustained defendants' demurrers to Tang's complaint and entered judgments of dismissal against him. Tang has appealed the judgments, alleging a number of errors by the trial court. For the reasons explained further below, we reject Tang's contentions of error and affirm the judgments of dismissal.

In a separate appeal, Tang argues that the trial court erred in awarding contractual attorney fees under Civil Code section 1717 to Chase. We agree and reverse the trial court's order.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Allegations in the Complaint*

In 2005, Tang executed a deed of trust securing a note for $825,500 on a residential property in San Jose (property).[2] The complaint alleges that, beginning in 2005, defendants Chase, U.S Bank, and SPS engaged in a joint venture and conspiracy to "illegally attempt[] to claim a beneficial interest" in the property and to unlawfully sell it in a nonjudicial foreclosure sale.

Washington Mutual Bank, FA (WaMu) was Tang's original lender and beneficiary of the trust deed. California Reconveyance Company (CRC) was the original trustee

---

[1] Tang's then-wife also executed the deed of trust, but she did not participate in this lawsuit. Tang also sued the entities that purchased the property at the trustee's sale in 2017, but later dismissed those parties (Orchard Terrace Inc., Monte Vista Oaks, Inc., Monte Vista Oaks DB Plan, and Kip Dream Homes) from the lawsuit. In addition, Tang sued Quality Loan Service Corporation (QLS), the trustee at the time of the nonjudicial foreclosure sale in 2017. QLS is not a party to these appeals. According to Tang, QLS was "dismissed pursuant to a declaration of non-monetary status pursuant to California Civil Code [section] 2924*l*" since it was "nothing more [than] the foreclosure trustee." The dismissal of QLS is not included in the record on appeal.

[2] The factual summary is based on the complaint and publicly recorded documents attached to the complaint. We assume the truth of all properly pleaded allegations in Tang's complaint, as well as those that are judicially noticeable. (*Heckart v. A-1 Self Storage, Inc.* (2018) 4 Cal.5th 749, 753.)

named in the deed of trust.  Defendant Deborah Brignac worked at CRC as a foreclosure specialist and supervisor.

On or about February 26, 2010, Brignac executed an assignment of the deed of trust on the property to assign the deed of trust from Chase to a securitized trust named "WaMu Mortgage Pass-Through Certificates Series 2005-AR19 Trust" (securitized trust).  On March 1, 2010, CRC recorded the assignment with the Santa Clara County Recorder.  Tang's claims on appeal largely center on this 2010 assignment executed by Brignac.

The complaint alleges Brignac in the February 26, 2010 assignment falsely claimed to be a "Vice President" of Chase and "fraudulently executed" the document.  The complaint does not explain how she fraudulently executed the assignment other than that she "never was a Vice President of JPMorgan Chase Bank."  The assignment, which is attached to the complaint as an exhibit, reflects that the assignment was signed by Chase as successor in interest to WaMu and contains Brignac's signature above a caption that reads "Deborah Brignac, Vice President."

According to the complaint, Brignac executed the assignment at the direction of CRC, and her claim that she was a vice president at Chase was fraudulent.  The complaint does not explicitly allege that Brignac did not have Chase's authority to sign the assignment on its behalf, although in the first cause of action it states that Tang seeks to have the assignment voided "for reasons of fraud, lack of authority, and forgery."

More generally, the complaint alleges Brignac fraudulently executed other unspecified documents on behalf of CRC.  The complaint does not indicate that these documents bear any relationship to the property.  The complaint alleges that Brignac has a "troubled past" and submitted "questionable" documents in Massachusetts.  The complaint also attaches purported letters from an individual with the title of "Register of Deeds" from Massachusetts that reference "robo-signers" generally but that do not name

3

Brignac. Brignac's name appears in a document attached to the complaint titled "McDonnell Property Analytics Approved Robo-signers List."

On March 1, 2010, CRC recorded a notice of default on the property that stated that the past due payments as of February 26, 2010, amounted to $14,954.54. No other notice of default was recorded prior to the foreclosure sale, which occurred approximately seven years later. Based on the time between the recording of the notice of default and the actual sale, the complaint alleges the 2010 notice of default is "stale."

The complaint alleges that, on or about March 10, 2014, defendant U.S. Bank "inserted itself into the chain or links of title." The complaint attaches a substitution of trustee pertaining to the deed of trust that indicates an entity called "ALAW" was now the trustee. In that same document, U.S. Bank is named as the institutional trustee of the securitized trust and "successor trustee to Bank of America, NA." The recorded document further notes defendant SPS is an "Attorney in Fact" for U.S. Bank.

Through another substitution of trustee recorded in March 2016, QLS became the trustee under the deed of trust. The substitution of trustee was executed by SPS as an attorney in fact for U.S. Bank (the trustee for the securitized trust). QLS recorded several notices of trustee's sale at Chase's direction.

In February 2017, QLS sold the property at a trustee's sale. The recorded trustee's deed upon sale, referencing the 2010 notice of default, states that a default had occurred, and Tang's unpaid debt on the property together with costs amounted to $1,228,617.12. The complaint does not dispute the fact of, or the amount in, default.

B. *Trial Court Proceedings*

Shortly following the foreclosure sale of the property in 2017, Tang filed a wrongful foreclosure lawsuit in Santa Clara County Superior Court. The trial court sustained Chase's demurrers to the original complaint and first amended complaint and granted Tang leave to amend.

4

In September 2017, Tang filed the operative complaint at issue here, the second amended complaint (complaint), against defendants.  He alleged six causes of action:  (1) declaratory relief (first cause of action); (2) "statutory violations," referencing various statutes, including provisions under the California Homeowner Bill of Rights (the HBOR) (second cause of action); (3) unlawful foreclosure (third cause of action); (4) slander of title (against Chase and QLS only) (fourth cause of action); (5) cancellation of recorded instruments (fifth cause of action); and (6) violation of California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (sixth cause of action).

Defendants filed demurrers to all six causes of action on various grounds and asserted Tang lacked standing to bring his claims.  Chase also filed a separate motion to strike the first cause of action for declaratory relief and argued that Tang had added this claim without leave of court following its ruling on the demurrer to the first amended complaint.  Tang opposed the demurrers and the motion to strike.

The trial court appears to have issued a tentative ruling in favor of Chase on its demurrer, although that ruling does not appear in the record on appeal.  Shortly thereafter, Tang submitted a document, entitled "Statement of How Plaintiff Will Amend the Pleading."  In this document, Tang proposed amending the complaint to allege the notice of default was "stale," that Brignac committed "forgery," and that the other defendants conspired to "perpetuate and profit from this forgery."  Tang stated Brignac's criminal actions of forgery "exceed that of alleged robo-signing" and "constitute forgery under California Penal Code [section] 470 and specifically [section] 470(d)," and that "[a] forged deed (or its assignment) is completely void and ineffective to transfer any title to the grantee."

Following a hearing, the trial court issued a written order in February 2018 sustaining Chase's demurrer to the complaint on numerous grounds, including that Tang lacked standing to challenge Brignac's execution of the assignment as a defect in the foreclosure.  The trial court also addressed various arguments applicable to the individual

causes of action, ruling for instance that Tang could not plead a claim for declaratory relief (first cause of action) because he had not received leave from the court to do so and that his slander of title (fourth cause of action) failed because he did not adequately plead malice. The trial court rejected Tang's theory of forgery as insufficient to cure Tang's lack of standing. The trial court did not grant Tang leave to amend the complaint. In a separate written order, the trial court sustained SPS's and U.S. Bank's demurrer based in part on Tang's lack of standing.

The trial court also issued a written order sustaining Brignac's demurrer to all causes of action. Among other rulings, the trial court concluded that Tang lacked standing. The trial court denied Tang's request for leave to amend the complaint against Brignac. The trial court's order on Brignac's demurrer admonished Tang's counsel for unprofessional attacks on Brignac made in a written submission to the court.

The trial court subsequently issued judgments of dismissal in favor of all defendants. Tang timely appealed the judgments of dismissal, and this court assigned docket No. H045898 to the appeal.

Following the judgment dismissing it as a party, Chase filed a motion in the trial court seeking to recover its attorney fees pursuant to Civil Code section 1717 and an attorney fee provision in the deed of trust. Tang opposed the motion, arguing that Chase had no contractual right to enforce the attorney fee provision based on its assignment of the loan in 2010 and asserting Chase's request for over $30,000 in attorney fees was excessive. Chase replied that it was entitled to recover its fees in its capacity as a prior servicer of the loan.

On January 2, 2019, the trial court ordered Tang to pay Chase $28,645 in attorney fees. The trial court also entered a separate order granting Chase costs in the amount of $1,691.84 and granting Tang's motion to tax costs as to messenger fees.

Tang timely appealed the trial court's January 2, 2019 order granting Chase attorney fees, and this court assigned docket No. H046697 to the appeal. This court

6

ordered that Tang's two appeals, docket Nos. H045898 and H046697, be considered together for oral argument and disposition.

## II. DISCUSSION

In his appeal of the judgments of dismissal, Tang argues the trial court erred in its conclusion that he lacks standing to challenge the 2010 assignment executed by Brignac. He contends he sufficiently pleaded that Brignac forged the 2010 assignment of the beneficial interest under the deed of trust, rendering that assignment void, and the trial court erred in deciding he lacked standing to challenge this wrongful conduct. He also argues the trial court erred in refusing him permission to amend his complaint, was biased against him, and should have provided a court reporter to him in light of his "modest means."

In his appeal of the postjudgment attorney fee order, Tang contends the trial court erred in determining that Chase was entitled to attorney fees pursuant to the terms of the deed of trust.

We turn first to Tang's appeal of the judgments of dismissal.

A. *Standards of Review*

We review de novo the trial court's decision to sustain the demurrers. " 'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' [Citation.] ' " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed." . . . Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " ' " (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768.)

We review the trial court's refusal to permit further amendment for abuse of discretion. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) Where the demurrer was sustained without leave to amend, we consider whether Tang could cure

7

the defect by an amendment. (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) Tang bears the burden of proof on this issue. (*Ibid.*)

Chase contends, and we agree, that Tang has forfeited any appeal of the trial court's decision sustaining the demurrer to the causes of action for declaratory relief (first cause of action) and cancellation of recorded instruments based on Civil Code section 3412 (fifth cause of action) by failing to present any argument in his appellate briefing on these points. In his opening brief, Tang neither argues how the trial court erred in its rulings on these causes of action nor explains how he might amend these causes of action in a new complaint and therefore has forfeited any argument challenging the trial court's sustaining of the demurrers to these causes of action. (See *Ram v. OneWest Bank, FSB* (2015) 234 Cal.App.4th 1, 9.)

We now turn to the four other causes of action in the complaint: (1) statutory violations (second cause of action), (2) unlawful foreclosure (third cause of action), (3) slander of title (fourth cause of action), and (4) violation of California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (UCL) (sixth cause of action). Tang's allegation that the 2010 assignment was void because Brignac fraudulently executed or forged the assignment underpins these causes of action.[3] For example, in the wrongful foreclosure cause of action, the complaint alleges the 2010 assignment by Brignac "was fraudulent, unlawful, and void" and therefore certain documents emanating from that assignment were "invalid and void" and thus defendants did not have the legal right to conduct or participate in the foreclosure sale.

---

[3] The complaint also alleges the 2010 assignment was void as untimely, because the securitized trust closed in 2005. The trial court rejected that claim based on its finding that a defect in the securitization process rendered the assignment voidable and not void, and therefore Tang lacked standing to the extent his action was predicated on the alleged untimely transfer. (See *Kalnoki v. First American Trustee Servicing Solutions, LLC* (2017) 8 Cal.App.5th 23, 43 [holding that "a securitized trust made after the trust's closing date is merely voidable"].) On appeal, Tang does not challenge that determination, and therefore we do not address it further.

Defendants on appeal maintain that Tang has no standing to challenge the 2010 assignment. We first consider the question of Tang's standing and then examine two other arguments made by Tang related to the second and sixth causes of action.

B. *Tang's Standing to Challenge the 2010 Assignment*

1. Standing Allegations in the Complaint

Tang's complaint alleges he has standing to challenge the foreclosure because the foreclosing party "lacked the authority to initiate the foreclosure because it held no beneficial interest under the deed of trust," and the deed of trust grants him the right to challenge the 2010 assignment and defendants' rights to foreclose upon his property.

In a section titled "factual allegations," the complaint alleges that, on or about February 26, 2010, Brignac "fraudulently executed" the assignment from Chase to the securitized trust and falsely claimed to be a "Vice President" of Chase. Among her "troubled past," the complaint generally alleges she engaged in robo-signing of recorded documents.[4] In addition to alleging she lacked authority to execute the assignment, the complaint also generally alleges that Brignac committed "forgery." The complaint does not provide any details about the alleged forgery.

2. Legal Principles Regarding Standing to Challenge Assignment

"Standing is a threshold issue necessary to maintain a cause of action, and the burden to allege and establish standing lies with the plaintiff." (*Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 810 (*Mendoza*).) In this context, standing denotes "a borrower's legal authority to challenge the validity of an assignment." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 928, fn. 3 (*Yvanova*).)

The California Supreme Court addressed standing in the postforeclosure context in *Yvanova*, *supra*, 62 Cal.4th 919. *Yvanova* held that a home loan borrower who has

---

[4] "The use of automated signatures" has been "colloquially referred to as 'robo-signing.' " (Greenwald & Bank, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2018) ¶ 6:536.16.)

9

suffered a nonjudicial foreclosure has standing to challenge an invalid assignment to the foreclosing entity that was "void" as opposed to merely "voidable." (*Id.* at pp. 942–943.) The California Supreme Court stated that the borrower's standing to challenge a void assignment and sale derives from his or her interest in ensuring that the beneficiary had legal authority to foreclose (*id.* at p. 924), noting that "[t]he borrower owes money not to the world at large but to a particular person or institution, and only the person or institution entitled to payment may enforce the debt by foreclosing on the security." (*Id.* at p. 938.) *Yvanova* explained that a void transaction is "without legal effect." (*Id.* at p. 929.)

By contrast, an assignment that is merely voidable does not afford standing to a non-party. As described in a later decision by the Court of Appeal, " 'California law,' the *Yvanova* court explained, 'does not give a party personal standing to assert rights or interests belonging solely to others. [Citations.] When an assignment is merely voidable, the power to ratify or avoid the transaction lies solely with the parties to the assignment; the transaction is not void unless and until one of the parties takes steps to make it so. A borrower who challenges a foreclosure on the ground that an assignment to the foreclosing party bore defects rendering it voidable could thus be said to assert an interest belonging solely to the parties to the assignment rather than to herself.' " (*Yhudai v. IMPAC Funding Corp.* (2016) 1 Cal.App.5th 1252, 1256–1257 (*Yhudai*).) "A voidable transaction, in contrast, 'is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance.' " (*Yvanova*, *supra*, 62 Cal.4th at p. 930.)

*Yvanova* did not decide whether the specific allegations at issue in that case (involving alleged defects in the securitization process) constituted a void or voidable transaction. (*Yvanova*, *supra*, 62 Cal.4th at p. 924.) However, post-*Yvanova*, several appellate courts have explored the distinction between a void and voidable assignment.

10

For example, *Saterbak v. JPMorgan Chase, N.A.* (2016) 245 Cal.App.4th 808 (*Saterbak*) considered whether a post-closing transfer of a note and deed of trust into a securitized trust renders the assignment void. The court in *Saterbak* held that an untimely assignment is voidable, not void. (*Id.* at p. 815.) *Saterbak* further addressed the allegation that a signature on the instrument was "forged or robo-signed" and decided that the borrower lacked standing to pursue those theories. (*Id.* at pp. 811, 814.) Similarly, *Mendoza* considered the assignment of plaintiff's deed of trust to the investment trust after the trust's closing date and alleged robo-signing of the documents and concluded such defects make an assignment voidable—not void. (*Mendoza*, *supra*, 6 Cal.App.5th at pp. 811, 817–820.)

### 3. Analysis

Tang's central claim on appeal is that he sufficiently pleaded facts that the 2010 assignment is void, and therefore he has standing to challenge it under the principles announced in *Yvanova*, *supra*, 62 Cal.4th 919. He acknowledges that if Brignac were a "bonafide" executive of Chase who had robosigned "hundreds of documents daily without reading them," he would not have standing to challenge the assignment as a matter of law. Tang argues, however, that the facts he pleaded in his case are different in nature because Brignac executed the assignment without any authority from Chase and committed "forgery."

Having carefully reviewed his complaint, we are not persuaded that Tang has met his burden of sufficiently pleading facts, as opposed to legal or factual conclusions, that the 2010 assignment is void. Tang generally points to the "standing" section in his complaint, but this section discusses legal principles and quotes from the *Yvanova* decision and other case law. These allegations do not contain any facts.

We are further not required to accept his assertion that the 2010 assignment was "void," because that is a legal—not a factual—conclusion. (*Yhudai*, *supra*, 1 Cal.App.5th at p. 1257.) Similarly, we are not required to accept the conclusory allegations that

11

Brignac acted without authority or committed "forgery." " '[L]egal conclusions,' 'adjectival descriptions' . . . or 'unsupported speculation' " are insufficient to withstand a demurrer. (*Doe v. Roman Catholic Archbishop of Los Angeles* (2016) 247 Cal.App.4th 953, 960; see also *Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1554.)

The only pertinent factual allegations pleaded in the complaint are that Brignac signed the 2010 assignment as the "Vice President" of Chase when in fact she was not a Chase officer and was only employed by the then-acting trustee, CRC. We do not agree that this assertion, even if accepted as true, renders the assignment void.

"A deed of trust to real property acting as security for a loan typically has three parties: the trustor (borrower), the beneficiary (lender), and the trustee." (*Yvanova*, *supra*, 62 Cal.4th, at p. 926.) "The trustee of a deed of trust is not a true trustee with fiduciary obligations, but acts merely as an agent for the borrower-trustor and lender-beneficiary." (*Id.* at p. 927.) There is no dispute that CRC was the trustee under the deed of trust and therefore an agent of Chase, the then-beneficiary. Tang's complaint does not explicitly allege, nor does it allege any facts that would give rise to a fair inference, that Brignac acted without Chase's authority.

Tang's unsupported legal conclusion that Brignac committed forgery is also insufficient to survive demurrer. A forgery is a " ' "writing which falsely purports to be the writing of another," ' and is executed with the intent to defraud." (*Schiavon v. Arnaudo Brothers* (2000) 84 Cal.App.4th 374, 382.) As a general matter, signing someone else's name is legally significant only if it was unauthorized and perpetrated with fraudulent intent. (See Pen. Code, § 470 [forgery requires signer's intent to defraud and knowledge that he or she lacks authority to sign the name of another person]; *Lewis v. Superior Court* (1990) 217 Cal.App.3d 379, 387 [crime of forgery under Pen. Code, § 470 derives from common law definition of forgery].) Tang does not allege that Brignac signed someone else's name, the signature as it appears in the 2010 assignment

12

attached to the complaint is not Brignac's signature, or the document was somehow altered. He does not specifically allege that Brignac signed the document without Chase's permission. The complaint does not allege Chase ever disputed the legitimacy of the 2010 assignment.

Even assuming arguendo that the complaint adequately alleged that Brignac either acted without Chase's authority when she signed the assignment or that she committed forgery (and the complaint alleges no specific facts supporting those conclusions), Chase could have ratified these actions. (*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73–74 [holding that a principal may ratify a forgery done by its agent]; Cal. U. Com. Code § 3403(a) (stating that "[a]n unauthorized signature may be ratified" and noting in a comment that " '[u]nauthorized' signature is defined . . . as one that includes a forgery as well as a signature made by one exceeding actual or apparent authority"]; *Navrides v. Zurich Ins. Co.* (1971) 5 Cal.3d 698, 703–704 [holding a principal may ratify agent's unauthorized act].) Because an unauthorized or forged signature can be ratified, such defects render the assignment voidable, not void. (See *Yvanova*, *supra*, 62 Cal.4th at p. 930.)

In support of his contention the 2010 assignment is void, Tang relies on the holding of *Sciarratta v. U.S. Bank National Assn.* (2016) 247 Cal.App.4th 552 (*Sciarratta*). However, *Sciarratta* is materially distinguishable. It involved the problem that a successor of the original lender (Chase) made two successive assignments of the same deed of trust (first to Deutsche Bank and then to Bank of America), and Bank of America foreclosed despite having received nothing under the second assignment. (*Id.* at p. 564.) That holding has no relevance to the allegations at issue here, which do not describe competing assignments of the same deed of trust. In this case, even accepting the properly pleaded allegations in the complaint as true, the defects in the 2010 assignment render it voidable, rather than void. Accordingly, Tang does not have standing to challenge the defects in that assignment.

13

In reaching our conclusion, we have considered *WFG National Title Insurance Company v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881 (*WFG*).[5] In *WFG*, Wells Fargo Bank, N.A. (the undisputed beneficiary of a valid deed of trust) and SPS (the loan servicer) argued that a subsequent deed that recorded a sham conveyance had been forged, and therefore the forged deed was void. (*Id.* at pp. 884–886.) The trial court agreed the forged deed was void. The Court of Appeal held that the trial court did not err as a matter of law in finding the deed of trust was void as opposed to voidable because the deed of trust was forged, given that the face of the deed falsely stated the deed was recorded by the trustee. (*Id.* at p. 890.)

*WFG* does not support Tang's contention in this appeal that he has standing because it does not address the question of whether a third-party (in this case Tang) rather than the beneficiary (in *WFG*, the bank) has standing. Indeed, it does not address the concept of standing at all. Moreover, for the reasons stated above, Tang's unsupported allegation that Brignac committed forgery in the assignment was a legal conclusion

---

[5] After this appeal was fully briefed, on July 15, 2020, Tang filed a document captioned "Notice of Recently Published Case" that cited to *WFG*. SPS and U.S. Bank filed a response to Tang's document arguing at length that *WFG* did not support Tang's claims. In response, Tang filed an objection and request to strike SPS's and U.S. Bank's responsive document. Shortly thereafter, in a separate filing, Chase and Brignac submitted an objection to Tang's July 15, 2020 original notice, arguing the document violates California Rules of Court, rule 8.254(b), which permits the citation of new authority to be by letter in which only the citation of authority is presented, without "argument or other discussion of the authority."

Having reviewed the various submissions related to Tang's July 15, 2020 notice, we conclude that the notice does include argument and discussion of *WFG* and therefore does not comply with California Rules of Court, rule 8.254(b). We therefore have only considered the authority cited by Tang and have disregarded his discussion and argument contained in that document. In light of the limited consideration we have given that document, we decline to strike it in its entirety. Turning to Tang's objection to, and request to strike SPS and U.S. Bank's submission, we likewise decline to strike their submission. Nevertheless, we have not considered the substance of their response.

14

insufficient to withstand demurrer. *WFG*, therefore, does not assist Tang in his contention that he has standing to challenge the validity of the 2010 assignment.

Tang's complaint, at best, establishes that the 2010 assignment was voidable by Chase—not void *ab initio*. Because the complaint does not allege sufficient facts to establish that the assignment in 2010 was void, his challenge to the assignment through the four causes of action for statutory violations, unlawful foreclosure, slander of title, and violation of the UCL fails as a matter of law for lack of standing.

4. <u>Standing Based on Language in the Deed of Trust</u>

Tang further contends that language in the deed of trust granted him, as the borrower, the right to sue "to assert the non-existence of a default or any other defense of Borrower to acceleration and sale." Tang has not asserted the nonexistence of a default, and his only purported "defense" to foreclosure is that the 2010 assignment is void. We have rejected that contention. Accordingly, the contractual language does not assist him here. (*Yhudai*, *supra*, 1 Cal.App.5th at p. 1260 [considering nearly identical language in deed of trust and rejecting claim of standing to attack validity of assignment based on that language].)

Tang also emphasizes the deed of trust was prepared by WaMu (the predecessor in interest to Chase) and, citing generally to Civil Code section 1654, argues that any ambiguity should be construed in his favor. However, Civil Code section 1654 states: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." This interpretive rule has no relevance here. Tang does not point to any ambiguity, and furthermore Civil Code section 1654 "does not stand for the proposition that, in every case where one of the parties to a contract points out a possible ambiguity, the interpretation favored by the nondrafting party will prevail." (*Rainier Credit Co. v. Western Alliance Corp.* (1985) 171 Cal.App.3d 255, 263.)

15

C. *HBOR Claims*

Alternatively, Tang contends he has standing and has pleaded claims under the Homeowner's Bill of Rights (HBOR). We understand his contention to apply to his second cause of action (for statutory violations) and sixth cause of action (UCL claim), which expressly refer to and quote certain provisions of the HBOR.

The HBOR was enacted in 2012, "while California was 'still reeling from the economic impacts of a wave of residential property foreclosures that began in 2007[.]' [T]he legislation sought to 'modify[] the foreclosure process to ensure that borrowers who may qualify for a foreclosure alternative are considered for, and have a meaningful opportunity to obtain, available loss mitigation options.' (Stats. 2012, ch. 87, § 1, subds. (a), (b))." (*Lucioni v. Bank of America, N.A.* (2016) 3 Cal.App.5th 150, 157 (*Lucioni*).) The HBOR went into effect in January 2013. (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 86, fn. 14.) The HBOR does not apply retroactively and does not independently grant Tang standing to challenge the 2010 assignment. (See *Saterbak*, *supra*, 245 Cal.App.4th at p. 818.)

To the extent his claims pertain to events subject to the HBOR (the foreclosure sale that occurred in 2017), Tang does not mention or discuss the trial court's finding that his HBOR claims were largely conclusory and unsupported by any facts. Having independently reviewed the complaint, we agree with the trial court's determination that the conclusory nature of his allegations that defendants violated the HBOR are not sufficient to survive demurrer. For example, the complaint alleges defendants violated Civil Code section 2924.17, subdivision (b) of the HBOR, which requires that, prior to recording or filing any foreclosure-related documents, "a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information." (Civ. Code, § 2924.17, subd. (b).)

16

With respect to that HBOR provision, the complaint alleges that defendants foreclosed on the subject property "without ensuring that they had reviewed competent and reliable evidence to [*sic*] giving them the right to foreclose." The complaint does not plead any facts explaining how defendants violated this provision of the HBOR including what evidence they failed to review prior to foreclosure. Therefore, Tang's causes of action in the complaint based on purported violations of the HBOR fail as a matter of law.[6]

   D. *UCL Claim Based on "Stale" Notice of Default*

Tang also asserts that he sufficiently pleaded claims based on the complaint's allegations that the 2010 notice of default (NOD) was "stale." The UCL claim (sixth cause of action) in the complaint expressly alleges that the nonjudicial foreclosure sale was premised on a "stale, and no longer valid due to staleness, notice of default recorded in 2010." The complaint alleges the NOD was stale because the foreclosure sale did not actually occur until approximately seven years later, in 2017.

As this allegation that the NOD was stale does not appear to hinge on Tang's standing, we review the complaint to determine whether the trial court erred in concluding that it failed to state any cognizable claim on this point. The trial court decided that any argument predicated on the NOD's staleness failed because there "are no statutory provisions requiring a foreclosing entity to re-issue a notice of default after a specified time."

The nonjudicial foreclosure process is formally initiated when the trustee records a notice of default. (*Yvanova*, *supra*, 62 Cal.4th at p. 927.) "The statutory notice of default is intended to give notice of the trustor's default to 'the trustor, the trustor's successors, to junior lienors, other interested persons, and . . . to the world.' " (*Kachlon v. Markowitz*

---

   [6] We note that Tang's statutory violations cause of action also alleged violations of provisions of the Penal Code related to the procurement, offering, or filing of forged instruments. Tang raises no claim on appeal as to these alleged violations, and the trial court correctly concluded Tang has no standing to enforce criminal statutes.

17

(2008) 168 Cal.App.4th 316, 339.) At the time the NOD was recorded in March 2010, there was no requirement that the NOD be reissued. (See *Lucioni*, *supra*, 3 Cal.App.5th at p. 157 [noting that most of the HBOR provisions contain "procedures to help borrowers obtain alternatives to foreclosure" and also noting that most of the provisions "place duties upon a lender *before* it may record a notice of default" (id. at p. 158) (italics added)].) Further, Tang does not allege that the lender failed to satisfy any of the explicit statutory requirements applicable to the NOD. (See former Civ. Code, § 2924 [listing required statements to be included in a notice of default]; former Civ. Code, § 2923.5; *Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 213–214 [former Civ. Code, § 2923.5 requires, "before a notice of default may be filed, that a lender contact the borrower in person or by phone to 'assess' the borrower's financial situation and 'explore' options to prevent foreclosure"].)

On appeal, Tang argues the HBOR imposed "new" requirements on notices of default that made notices of default "recorded prior to January 1, 2013 out of date, i.e., stale." Tang fails to provide any authority supporting his position, and the HBOR does not apply retroactively. (See *Saterbak*, *supra*, 245 Cal.App.4th at p. 818.) Our independent research has not uncovered any such requirement. Nor does our review of the HBOR suggest that the Legislature intended that a pre-HBOR notice of default would become invalid upon enactment of the HBOR. Therefore, the trial court did not err in sustaining the demurrer to the complaint for failing to state a cognizable claim.

We also reject Tang's unsupported claim that the 2010 NOD was invalid because it contained an older default figure. Tang does not provide any legal authority for the proposition that the NOD was invalid because it did not contain an updated default amount, and he does not dispute that he received notice of his default and was in default during the pertinent time period. Nor does he dispute (as reflected in the trustee's deed upon sale attached to the complaint) that the loan was in default in an even greater

18

amount by 2017 than it had been in 2010. He does not contend he paid any amount of the default.

For the above reasons, we conclude the trial court did not err in sustaining the demurrer as to Tang's UCL claim that alleged the NOD was stale or invalid because it did not contain an updated figure of the amount in default.

E. *Leave to Amend*

As noted earlier, after a demurrer is sustained without leave to amend, on appeal we consider "whether there is a 'reasonable possibility' that the defect in the complaint could be cured by amendment. [Citation.] The burden is on plaintiffs to prove that amendment could cure the defect." (*King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1050.) Tang addresses this issue by pointing to his statement of decision filed with the trial court that proposed amending the complaint to allege the notice of default was "stale" into each cause of action, and that Brignac committed "forgery" and the other defendants conspired to "perpetuate and profit from this forgery." He stated Brignac's criminal actions of forgery "exceed that of alleged robo-signing," and that "[a] forged deed (or its assignment) is completely void and ineffective to transfer any title to the grantee." These assertions do not assist Tang for the reasons we have explained above, namely that they are comprised of either unsupported conclusions (i.e., the instruments are "void" or Brignac committed forgery) or are based on the faulty legal premise that the notice of default become "stale" over time and had to be reissued prior to foreclosure.

Because there is no reasonable possibility that the defects in Tang's complaint could be cured by amendment, the trial court did not abuse its discretion in sustaining the demurrers without leave to amend. (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1008.)[7]

---

[7] In light of this conclusion, we need not address defendants' arguments that the judgment should be affirmed on alternative grounds, such as that Tang failed to allege

19

F. *Other Claims Related to Demurrer Proceedings*

      1. <u>Lack of Court Reporter</u>

Tang also suggests that his rights were violated because the Santa Clara County Superior Court no longer provides court reporters in civil matters, and that persons of "modest means" such as himself are faced with paying for a reporter at "significant cost." The record on appeal does not contain any reporter's transcripts.

In his written filings with the trial court that are included in the record, Tang did not request that the trial court provide him with a court reporter nor object to the lack of a court reporter. Tang filed a statement explaining how he would amend his complaint in which he noted that court reporters were not provided, but he made no objection on that ground. Based on these circumstances, we conclude Tang has forfeited any challenge to the lack of a court-provided court reporter. (See *Children's Hosp. & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 776.)

Moreover, even if we were to deem the claim not forfeited, Tang has not established prejudicial error. (Cal. Const., art. VI, § 13; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780.) Tang does not articulate any legal error, let alone prejudicial error, connected to his failure to procure a court reporter. He does not assert or explain how the lack of a reporter's transcript in the appellate record prevents our review of his claims. It is well settled that we must independently review his complaint (see *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865), and we have done so.

We are also able to review Tang's claim that the trial court should have permitted him to amend the complaint for a third time. Tang filed a statement of how he would amend his complaint, and the trial court permitted him to "orally argue from the document." For the reasons we have explained, we reject, on its merits, his claim that the

---

willingness or ability to tender the outstanding amount of the debt, the recordings at issue in the slander of title cause of action were privileged, and Tang failed to allege an injury caused by defendants' purported UCL violations.

trial court abused its discretion in refusing to grant him leave to amend.  Moreover, he had the opportunity to present new facts on appeal; he has not done so.  (See *Total Call Internat. Inc. v. Peerless Ins. Co.* (2010) 181 Cal.App.4th 161, 166.)  Given the circumstances of this case, we decline Tang's invitation that we articulate "guidelines" for the trial court to follow to preserve the record whenever a litigant is of "modest means."

### 2.  Judicial Bias

Tang asserts the trial court demonstrated improper bias when it took offense to statements made by Tang's counsel that compared Brignac to a Nazi soldier.  We have reviewed the court's statements cited by Tang, and we do not agree they show any improper bias by the trial court.  Our review of the record has found nothing that suggests "a reasonable person would entertain doubts concerning the judge's impartiality" (*Christie v. City of El Centro* (2006) 135 Cal.App.4th 767, 776) or that " 'would cause us to lack confidence in the fairness of the proceedings such as would necessitate reversal' " (*Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1008).  We therefore reject Tang's argument of improper judicial bias.

For these reasons, we reject Tang's arguments against the trial court's orders sustaining the demurrers and therefore affirm the judgments of dismissal.[8]  We turn now to his appeal of the postjudgment order awarding Chase attorney fees.

---

[8] We deny Tang's request for judicial notice of an article purportedly published in the Daily Journal on September 11, 2019, and titled "UCLA professor uncovers nationwide scams involving fake court orders."  Chase and Brignac opposed Tang's request on numerous grounds.  Having reviewed all the submissions related to Tang's request, we are not persuaded this article is relevant to any material issue here.  (See *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2.)  We therefore deny Tang's request.

G. *Appeal of Attorney Fee Award (Docket No. H046697)*

Following the judgment of dismissal of the complaint against it, Chase moved for attorney fees.[9]  In support of its request, Chase relied on contractual provisions in the deed of trust.  In particular, it contended it was a beneficiary of section 9 of that contract in its capacity as a former servicer of the loan and primarily cited Civil Code section 1717 in support of its fee motion.[10]  On January 2, 2019, the trial court entered an order awarding Chase $28,645 in attorney fees.

Tang contends the trial court erred in this order because the language in the deed of trust, the contract underpinning Chase's attorney fee request, does not provide for an award of attorney fees to Chase.  Tang appeals only the legal basis for the attorney fee award and does not argue the trial court abused its discretion in the calculation of the award.

### 1.  Additional Background

Chase primarily cites to sections 9 and 14 as the provisions of the deed of trust (DOT) relevant to its entitlement to attorney fees.[11]  Section 9 of the DOT, titled

---

[9] It appears only Chase sought attorney fees in the trial court from Tang.  The other defendants are not parties to docket No. H046697.

[10] Appellant's opening brief suggests he also seeks to appeal the trial court's award of $1,691.84 in costs to Chase.  However, his notice of appeal does not reflect an appeal of that order and does not mention costs at all.  Likewise, his civil case information statement attaches only the attorney fee order as the order being appealed.  On this record, we conclude we do not have jurisdiction to consider any appeal of the order awarding costs to Chase.  (Cal. Rules of Court, rule 8.100(a)(2).)

[11] Chase also argues on appeal that sections 11 and 22 in the DOT expressly provide for an award of attorney fees.  We have reviewed those provisions and do not agree they specifically provide for the award of attorney fees.  Section 11 is titled "Assignment of Miscellaneous Proceeds; Forfeiture" and does not discuss the provision of attorney fees but rather is directed to the "proceeds of any award or claim for damages."  Section 22 is titled "Acceleration; Remedies" and states the lender, when "pursing the remedies provided in this Section 22," is entitled to "including, but not limited to, reasonable attorneys' fees and costs of title evidence."  We do not read this language as reasonably allowing attorney fees to be recovered in a postforeclosure litigation.

"Protection of Lender's Interest in the Property and Rights Under this Security Instrument," provides in relevant part:  "If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, [or] (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including . . . (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument."

Section 9 of the DOT also states:  "Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment."

Section 14 of the DOT, titled "Loan Charges," states in relevant part, "Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees."

In July 2018, citing to section 9 of the DOT, Chase moved for attorney fees relying on Civil Code section 1717, Code of Civil Procedure sections 1021 and 1033, subdivision (a)(10), and California Rules of Court, rule 3.1702(a).  Chase conceded that it was not a signatory to the deed of trust but nevertheless asserted it was entitled to fees as a servicer of the loan from 2008 until 2013.  Chase filed a request for judicial notice requesting the trial court take notice of the DOT (dated June 2005) and other documents.

Chase requested an award of $31,338.18, which it contended represented its reasonable fees, and included "prospective fees expected to be incurred in the prosecution of this Motion (opposition review, reply, hearing attendance)."  Chase submitted declarations connected with the fees requested that included billing statements.

Tang filed an opposition to Chase's request, contending, among other arguments, that Chase had no contractual basis to seek attorney fees as the foreclosure sale had extinguished the deed of trust, Chase was not the lender under section 22 of the deed of trust, and Chase was not an intended third party beneficiary of that contract.

In September 2018, the trial court entered an order granting attorney fees in favor of Chase but requested that Chase submit a more detailed chart setting out the hours expended by each attorney and the amounts charged by hour for that attorney. On October 11, 2018, Chase filed a supplemental declaration that attached a spreadsheet setting out the total amount of time and fees sought by Chase. Chase stated that the total amount spent through the filing of the motion was $28,645.

On January 2, 2019, the trial court issued the attorney fee order underlying this appeal. The trial court granted Chase's motion for attorney fees in part and ordered Tang to pay Chase fees in the amount of $28,645. Regarding Chase's entitlement to fees, the trial court's written order stated, "The Court finds that, as argued by [Chase], the subject agreement was not extinguished by the foreclosure on the subject property, only the security; that the agreement in question provided for attorney fees to the prevailing party in any litigation; and[] that Chase is the prevailing party and is entitled to an award of attorney fees." The trial court did not explain which "agreement" it was referring to, but the parties on appeal cite the DOT as the sole contractual basis for the trial court's attorney fee award.

### 2. Legal Principles

We review de novo the legal basis for an attorney fee award. (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*).) "Under the American rule, each party to a lawsuit ordinarily pays its own attorney fees. [Citation.] Code of Civil Procedure section 1021, which codifies this rule, provides: 'Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or

implied, of the parties . . . .' . . . Thus, ' "[p]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract." ' " (*Ibid.*)

"If such litigation does sound in contract, however, an agreement allocating attorney fees may be 'within the scope of [Civil Code] section 1717' and subject to its restrictions. [Citation.] 'Before section 1717 comes into play, it is necessary to determine whether the parties entered an agreement for the payment of attorney fees, and if so, the scope of the attorney fee agreement.' [Citation.] This determination requires us to apply traditional rules of contract interpretation." (*Mountain Air*, *supra*, 3 Cal.5th at p. 752, fn. omitted.) In accordance with the parties' arguments on appeal, we consider only the DOT as the relevant agreement allocating attorney fees.

### 3. Analysis

Having considered the language of the deed of trust provisions and the authorities cited by both parties, we conclude that the language in the deed of trust does not support the attorney fee award to Chase ordered by the trial court. In *Hart v. Clear Recon Corp.* (2018) 27 Cal.App.5th 322, 325, 326–329 (*Hart*), which involved a wrongful foreclosure action, the Second District Court of Appeal, Division Eight, analyzed section 1717 and a deed of trust provision identical to section 9 of the DOT. Based on the same language contained in section 9 here, which provided that amounts incurred by lender would become additional debt of borrower, the Court of Appeal concluded that the plain language of the provision did not satisfy section 1717's requirement that there be a contractual provision that specifically provides that attorney's fees and costs " 'shall be awarded' " either to one of the parties or the prevailing party. (*Id.* at pp. 325, 327.) Rather, the pertinent provision stated "that attorney's fees, like any other expenses the lender may incur to protect its interest, will be added to the secured debt." (*Id.* at p. 327.) Based on that language, the court concluded that the agreement did not contemplate the provision of attorney fees. (*Ibid.*)

The parties to the DOT here similarly agreed that attorney fees incurred as described under section 9 would become additional debt secured by the deed of trust and that the lender could "charge" the borrower fees for services performed in connection with the borrower's default, including attorney fees, under section 14. In our view, the plain language of these provisions in the DOT do not specifically provide for a freestanding attorney fee award to a party or a prevailing party. Thus, section 1717 does not apply.

Chase in its briefing cites to *Chacker v. JPMorgan Chase Bank, N.A.* (2018) 27 Cal.App.5th 351 (*Chacker*) as support for the trial court's attorney fee order. However, *Chacker* does not assist Chase. In *Chacker*, the Second District Court of Appeal, Division Five, construed a claim by Chase and CRC for attorney fees based on a deed of trust with language identical to that in the DOT at issue in this appeal. The court in *Chacker* concluded that the language of the deed of trust did not entitle Chase and CRC to a freestanding attorney fee award as had been ordered by the trial court, stating that it was "essentially" construing section 9 in the same way as in *Hart*. (*Id.* at p. 358, fn. 6.) Moreover, the *Chacker* court further analyzed the import of section 14, an issue not reached in *Hart*, and held that that provision did not allow for an attorney fee award. (*Id.* at pp. 357, 358, fn. 6.)

The court in *Chacker* explained, "Where not authorized by statute, entitlement to attorney fees derives from the contractual terms chosen. Just as parties may limit or expand the circumstances under which attorney fees are awardable [citation], they may also limit or expand how those attorney fees may be obtained. Here, the parties to the deed of trust agreed attorney fees incurred as described under section 9 would become additional debt secured by the deed of trust. They also agreed the lender could 'charge' the borrower fees for services performed in connection with the borrower's default, including attorney fees, under section 14. As we have explained, the trust deed is properly read (only) to permit attorney fees to be added to the borrower's promissory

26

note obligation, and the terms of the trust deed itself are all the 'authority' that is necessary under the circumstances." (*Chacker*, *supra*, 27 Cal.App.5th at p. 357.)

We recognize that *Chacker* is a preforeclosure case. However, as we are interpreting the same attorney fee provision language here and the DOT makes no distinction in this regard, this factual difference does not affect the analysis of the contractual language. Thus, even if we were to follow *Chacker,* as Chase urges, the decision at most supports the conclusion that sections 9 and 14 of the DOT provide only that attorney fees may be added to the borrower's promissory note obligation. *Chacker*'s reasoning does not support the trial court's attorney fee order here, which ordered attorney fees after the property was sold at a nonjudicial foreclosure sale, which extinguished any obligation Tang had under the promissory note.

The other cases Chase relies on to support the attorney fee order also do not assist Chase, because those other cases relied on additional contractual language to support the fee award. In *Lacayo v. Seterus, Inc.*, Case No. CV1702783–AB (JEMx) (CD Cal., June 25, 2018,) [2018 WL 3326662] (*Lacayo*), the federal district court relied in part on a provision in the promissory note that stated, in the event of a default, the defendant has " 'the right to be paid back by [Plaintiffs] for all of its costs and expenses in enforcing this [n]ote. . . . Those expenses include, for example, reasonable attorney's fees.' " (*Id.* at *3.) Chase relied upon no such provision here and, based on our review, the promissory note was not included as part of Chase's motion for attorney fees and does not appear elsewhere in the record on appeal.

In *Jones v. Union Bank of California* (2005) 127 Cal.App.4th 542, the promissory note stated if it were "not paid, the makers would 'pay all costs of collection including, . . . reasonable attorneys' fees, and all expenses in connection with the protection or realization of the collateral securing th[e] Note.' " (*Id.* at p. 544.) In addition, the guarantee of the note contained a provision for attorney fees in " 'proceedings involving Guarantors that in any way affect the exercise by Lender of its

27

rights and remedies hereunder.' " (*Ibid.*)  This language is materially different from that in the DOT here, which does not affirmatively permit an attorney fee award but rather only permits the lender to "charge" the fees to the outstanding amount due.

Chase does not point to any other contractual language in the DOT that supports its entitlement to attorney fees following the nonjudicial foreclosure sale of the property. For these reasons, we conclude the trial court erred in its award of attorney fees to Chase.

### III.  DISPOSITION

In appeal No. H045898, the judgments of dismissal are affirmed.  In appeal No. H046697, the trial court's January 2, 2019 order awarding Chase its attorney fees is reversed.  In the interests of justice, the parties shall bear their own costs on appeal.

_____
                                    Danner, J.



WE CONCUR:






_____
Greenwood, P.J.







_____
Grover, J.







**H045898, H046697**
*Tang v. JP Morgan Chase Bank, et al.*